James MEAD and Roger Mead, dba
Mead's Market, Plaintiffs-Appellees,

v.

RETAIL CLERKS INTERNATIONAL
ASSOCIATION, LOCAL UNION NO.
839, AFL–CIO, Defendant-Appellant.

James MEAD and Roger Mead, dba
Mead's Market, Plaintiffs-
Appellants,

v.

RETAIL CLERKS INTERNATIONAL
ASSOCIATION, LOCAL UNION NO.
839, AFL–CIO, Defendant-Appellee.

Nos. 72–3043, 72–3044.

United States Court of Appeals,
Ninth Circuit.

Oct. 2, 1975.

Barry S. Jellison, Davis, Cowell & Bowe (argued), San Francisco, Cal., for appellant in No. 72–3043 and for appellee in No. 72–3044.

Ted R. Frame, Frame & Courtney (argued), Coalinga, Cal., for appellee in No. 72–3043 and for appellant in No. 72–3044.

## OPINION

Before BROWNING and SNEED, Circuit Judges, and SKOPIL,* District Judge.

BROWNING, Circuit Judge:

James and Roger Mead, former partners in Mead's Market, a grocery store, sued under section 303 of the Labor Management Relations Act, 29 U.S.C. § 187,[1] to recover damages allegedly sustained as a result of a strike conducted

---

* Honorable Otto R. Skopil, Jr., United States District Judge, District of Oregon, sitting by designation.

1. 29 U.S.C. § 187 reads:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or[1] any violation

[1] So in original. Probably should read "of."

of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

by Local 839 of the Retail Clerks International Association in part to compel the Meads to agree to a clause prohibited by section 8(e) of the Act, 29 U.S.C. § 158(e).[2]

The Union proposed that the Meads accede to a master agreement between the Union and other grocery stores in the area. This agreement contained a "demonstrator clause" providing that food demonstrators passing out samples of particular products and commending them to the store's customers must be covered by all terms of the agreement, whether the demonstrators were employed by the Meads or by the Supplier of the product being promoted. The Meads rejected the proposed contract, objecting not only to the demonstrator clause but also to provisions relating to wages, health and welfare benefits, pensions, and more. The Union called a strike and commenced picketing.

The Meads filed an unfair labor practice charge with the National Labor Relations Board, contending that the "demonstrator clause" was a "hot cargo" clause prohibited by section 8(e) of the Act, and that the Union was violating section 8(b)(4)(A) of the Act, 29 U.S.C. § 158(b)(4)(A),[3] by exerting economic pressure to compel the Meads to agree to the clause.

The Board agreed that the proposed clause was prohibited by section 8(e) insofar as it applied to demonstrators who were employees of a supplier and not of the Meads. The Board ordered the Union to cease striking to obtain the clause and to notify the Meads it would no longer insist that the clause be included in the contract. *Retail Clerks Local 1288,* 163 N.L.R.B. 817 (1967). The Board's order was enforced with a modification to make it clear that demonstrators who were employees of the Meads rather than a supplier could be covered by the collective bargaining agreement. *Retail Clerks Local 1288 v. NLRB,* 129 U.S.App.D.C. 92, 390 F.2d 858 (1968).

The Meads then filed this action to recover damages for injuries sustained as a result of the strike, contending that they were entitled to recover all their losses since one objective of the strike and picketing had been unlawful.

The district court rejected the Union's argument that section 303 does not afford a remedy to an employer who, like the Meads, was engaged in a primary labor dispute with the offending union. The court found that the Union sought lawful objectives as well as the unlawful objective, and that the consequence of these lawful and unlawful motivations was a single, inseparable course of conduct—the strike and picketing.

Because the consequence of the Union's lawful and unlawful objectives was inseparable, the court awarded the Meads damages for all losses sustained until the union withdrew its demand for

**2.** 29 U.S.C. § 158(e) reads in pertinent part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible (sic) and void

. . . . .

**3.** 29 U.S.C. § 158(b)(4)(A) provides:

(b) It shall be an unfair labor practice for a labor organization or its agents—

   \*    \*    \*    \*    \*    \*

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section.

the demonstrator clause,[4] a total of $12,-798. The court also awarded $750 in attorneys' fees incurred by the Meads in the unfair labor practice proceedings but refused to award attorneys' fees incurred in the prosecution of this action.

The Union appealed both aspects of the damage award. The Meads appealed the denial of attorneys' fees for this lawsuit.

■ We agree with the district court that section 303 provides a damage remedy in the circumstances of this case. We hold, however, when a union exerts economic pressure to achieve both lawful and unlawful objectives and the consequences are not separable, damages cannot be recovered unless the unlawful objective was a substantial cause of the pressure. We remand for a determination on this factual issue. Finally, we further hold that attorneys' fees cannot be recovered in a section 303 suit.

## I

The Meads had a right to sue for damages under the literal language of section 303. Subsection (a) of section 303 provides that it is unlawful, for purposes of that section, for a labor organization "to engage in activity or conduct defined as an unfair labor practice in section [8(b)(4)]." Subsection (b) of section 303 provides that whoever is injured "by reason of any violation of subsection (a) of this section shall recover the damages by him sustained and the cost of suit." The Board and the Court of Appeals for the District of Columbia Circuit have determined that the proposed demonstrator clause was illegal under section 8(e) and that the Union's insistence on the clause violated section 8(b)(4)(A). This determination is binding upon us. *Paramount*

*Transport Systems v. Teamsters Local 150,* 436 F.2d 1064 (9th Cir. 1971). The literal conditions for suit under section 303(b) are therefore satisfied. Moreover, we have affirmed a finding of liability under section 303 under circumstances quite similar to those presented here, though without discussion. *Carpenters Local 1273 v. Hill,* 398 F.2d 360 (9th Cir. 1968).

The Union argues, nonetheless, that section 303 does not give the Meads a remedy. As the Union correctly points out, the secondary boycott provisions of the Act are not to be read literally, if to do so would frustrate Congress' purpose (*Connell Construction Co. v. Plumbers & Steamfitters Local 100,* 421 U.S. 616, at 628, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975)); and since the applicability of section 303 was not contested in *Carpenters Local 1273, supra,* that case is not controlling on the issue. *United States v. Tucker Truck Lines,* 344 U.S. 33, 37–38, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925); *Soyka v. Alldredge,* 481 F.2d 303, 306 (3d Cir. 1973).

The Union contends that section 303 does not apply for two reasons: (1) because section 303 was intended to provide relief for a neutral employer injured by secondary activity employed by the union in a struggle against another employer, and not to provide relief for a primary employer, like the Meads, injured by a primary picket line; and (2) because section 303 was intended to apply to "traditional secondary boycotts" and not to pressures exerted in support of "hot cargo clauses."

■ The first argument rests upon factual assumptions rejected by the Board and the Court of Appeals in the unfair labor practices proceeding, as well

4. Picketing began on December 30, 1964, and lasted until January 14, 1966. The Union contended at trial that it had withdrawn its demand for the unlawful demonstrator clause at a bargaining session on July 16, 1965. The Meads contended that the Union first withdrew its demand in a letter dated October 6, 1965. The district court found that the with-drawal occurred on October 6, and we cannot say this finding is clearly erroneous.

Picketing stopped for one day on October 6, but resumed immediately and continued as before until January 1966. The damage award covered the period from December 30, 1964, to October 6, 1965.

as by the trial court in this action. At all relevant times the demonstrators in Mead's Market were employed by the suppliers whose product they promoted and not by the Meads. The demonstrator clause would have made these employees subject to all of the terms of the collective bargaining agreement, including a union security clause. The Meads were not concerned with the Union affiliation of employees of the suppliers. With respect to this issue they were innocent bystanders in a present or potential quarrel between the Union and other employers, the suppliers. The Union's activity to compel adoption of the proposed clause was therefore secondary, not primary, in its aim. *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 644–45, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). It was the purpose of section 8(b)(4)(A) to prohibit this kind of secondary activity. As the unfair labor practice proceedings in the case demonstrate, such activity is no less unlawful when it is directed against an employer with whom the union is also engaged in a primary dispute. Similarly, existence of a primary dispute affords no reason for denying the statutory remedy to an employer injured by secondary activity prohibited by section 8(b)(4)(A).[5]

The argument that section 303 was intended to provide a remedy only for damages from "traditional secondary boycotts," and not from union efforts to secure a contract clause prohibited by section 8(e), rests entirely upon the fact that in the Senate Committee analysis of the 1959 Act and in statements on the floor of the Senate and House, the amendments to section 303 were described as conforming the remedy provided by that section to concurrent modifications of the "secondary boycott provision," and of section 8(b)(4) generally, without specific mention of the "hot cargo" provision or of section 8(e).[6] The argument is insubstantial.

General references to "secondary boycott provisions" and to section 8(b)(4) were sufficient to include the "hot cargo" clause prohibitions in sections 8(e) and 8(b)(4)(A). These prohibitions were adopted to close a potential loophole in the anti-boycott provisions disclosed by *Carpenters Union v. NLRB,* 357 U.S. 93, 107–08, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). *See Connell Construction Co. v. Plumbers & Steamfitters Local 100, supra, .* 421 U.S. at 628, 95 S.Ct. 1830. They are an integral part of Congress' scheme to proscribe conduct commonly identified by the generic tag, "secondary boycott," i. e., "pressure tactically directed toward a neutral employer in a labor dispute not his own." *National Woodwork Manufacturers Association v. NLRB, supra,* 386 U.S. at 623, 87 S.Ct. at 1257. The references to section 8(b)(4) necessarily included subsection 8(b)(4)(A), which prohibits economic pressures exerted in support of clauses prohibited by section 8(e).

Section 8(e) imposes a duty on an employer to resist agreeing to a contract provision that commits him in advance to cease doing business for prohibited reasons. It is consistent with congressional purposes, and only fair, that an employer injured as a result of such ob-

---

5. Since a primary employer can recover for injury resulting from secondary pressure brought to bear upon another employer (*United Brick & Clay Workers v. Deena Artware, Inc.,* 198 F.2d 637 (6th Cir. 1952)), there is no apparent reason why recovery should not be allowed for injury resulting from secondary pressure imposed upon the primary employer himself.

As the Court said in *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 632, 87 S.Ct. 1250, 1262, 18 L.Ed.2d 357 (1967), "Congress, in enacting § 8(b)(4)(A) of the Act . . . barred as a secondary boycott union activity

directed against a neutral employer, including the immediate employer when in fact the activity directed against him was carried on for its effect elsewhere." Cf. *Flame Coal Co. v. United Mine Workers,* 303 F.2d 39, 42 (6th Cir. 1962); *United Brick & Clay Workers v. Deena Artware, Inc.,* 198 F.2d 637, 643–44 (6th Cir. 1952).

6. *See, e. g.,* I NLRB, Legislative History of the Labor-Management Reporting & Disclosure Act of 1959, at 966; *id.,* Vol. II, at 1472(2), 1523(3), 1859(3).

ligatory resistance in the face of coercion prohibited by section 8(b)(4)(A) should have a remedy under section 303.

## II

■ The Meads could not recover damages under section 303 by showing only that the Union violated section 8(b)(4)(A) and that the Meads were within the class of persons afforded a remedy by section 303. They must also show they were "injured in [their] business or property by reason of" the violation. The Union contends that in two related respects the Meads failed to carry their burden of proof on this question of causation. First, the Union argues there was insufficient proof that the Meads' loss of profits resulted from the strike and picketing rather than from other factors, including business conditions and publicity regarding unfair labor practice charges filed against the Meads for refusing to bargain with the Union. Second, the Union argues that even if the evidence does support the finding that the Meads' business losses were attributable to the strike and picketing, the Meads did not establish that this Union activity in turn resulted from the Union's demand for the demonstrator clause rather than its demands for lawful contract provisions. Both arguments rest upon the fact that lawful forces may have combined with an unlawful force to bring about the injury. The second argument raises the problem of multiple motivations for a single course of conduct; the first argument raises the problem of multiple causes of economic injury, one of which may have been that single course of conduct.

The solution to both problems is found in a body of authority developed primarily under the antitrust laws. Section 303 was enacted as an alternative to subjecting unions to antitrust liability for secondary activities. *Connell Construction Co. v. Plumbers & Steamfitters Local 100, supra,* 421 U.S. at 634, and n. 15, 95 S.Ct. 1830 and n. 15. The language of section 303 was drawn directly from the treble damage provision of the Clayton Act, with a modification not relevant here. *Teamsters Union v. Morton,* 377 U.S. 252, 260 n. 16, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). In the antitrust context, the "by reason of" language is read as incorporating common law principles of causation, *Albrecht v. Herald Co.,* 452 F.2d 124, 127–28 (8th Cir. 1971); *Ford Motor Co. v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 885 (1st Cir. 1966); *Haverhill Gazette Co. v. Union Leader Corp.,* 333 F.2d 798, 805–06 (1st Cir. 1964); *Momand v. Universal Film Exchanges, Inc.,* 172 F.2d 37, 43 (1st Cir. 1948); *cf. Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073, 1075 n. 2 (9th Cir. 1970), with such modifications as may be suggested by the statute as a whole, and by Congress' object and purpose. The same reading is appropriate here.

Reading section 303 in this manner, injury occurred "by reason of" particular unlawful conduct if such conduct "materially contributed" to the injury, *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 702, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir. 1974), or was a "substantial factor" in bringing it about, *Mulvey v. Samuel Goldwyn Productions, supra,* 433 F.2d at 1075 n. 3; *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2d Cir. 1970); Restatement (Second) of Torts § 431(1), "notwithstanding other factors contributed also." *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 143–44, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (White, J., concurring), *quoting Momand v. Universal Film Exchanges, Inc., supra,* 172 F.2d at 43; *see also Ford Motor Co. v. Webster's Auto Sales, Inc., supra,* 361 F.2d at 885; *Haverhill Gazette Co. v. Union Leader Corp., supra,* 333 F.2d at 805–06; *Switzer Brothers,*

*Inc. v. Locklin,* 297 F.2d 39, 47 (7th Cir. 1961).[7]

■ Nor were the Meads required to establish the fact of resultant injury to their business with certainty. "Regarding the quantum of proof required to establish the fact of damage, the rule is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between the defendant's wrongful act and some loss of anticipated revenue." *E. V. Prentice Machinery Co. v. Associated Plywood Mills, Inc.,* 252 F.2d 473, 477 (9th Cir. 1958); *see also Ford Motor Co. v. Webster's Auto Sales, Inc., supra,* 361 F.2d at 883. It is sufficient if the evidence "support[ed] a just and reasonable inference that [the Meads] were damaged by [the Union's] action." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).

Turning to the first of the two asserted deficiencies in proof of causation, the Union summarizes its argument as follows:

Contemporaneous with the picketing, there were a number of other factors which could easily have caused the drop in profits: the retirement of Morris Mead, the decision to lower prices, the decision to advertise less, the aftermath of tearing up the store for remodeling, the bad publicity from Mead's Market's violation of the Act, the handbilling, the advertising in the newspapers, the letter to customers, the possibility that plaintiff's wholesale business dropped off or was discontinued, possible decline in profits for all food stores in the area. In view of all these factors extrinsic to the picketing, it cannot be found with the requisite degree of finality that the picketing caused the loss of profits.

The Union's argument misapprehends, or misapplies, the principles applicable to proof of causation in a case such as this.

As the Supreme Court pointed out in the antitrust context:

Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Bigelow v. RKO Pictures, Inc., supra,* 327 U.S. at

7. An analogous problem of determining liability when a number of motivations may have brought about a single act arises in discharge cases under § 8(a)(3) of the Act. "[T]he cases are legion that the existence of a justifiable ground for discharge will not prevent such discharge from being an unfair labor practice [under § 8(a)(3)] if partially motivated by the employee's protected activity; a business reason cannot be used as a pretext for a discriminatory firing." *NLRB v. Ayer Lar Sanitarium,* 436 F.2d 45, 50 (9th Cir. 1970). But it is also clear that the illegal objective must play a significant role in the termination decision for liability to attach. The appropriate test has been variously expressed as whether the legitimate business reason was the "moving cause" behind the discharge, *NLRB v. West Coast Casket Co.,* 469 F.2d 871, 874 (9th Cir. 1972);

*NLRB v. Ayer Lar Sanitarium, supra,* 436 F.2d at 50; *NLRB v. Security Plating Co.,* 356 F.2d 725, 728 (9th Cir. 1966), or, stated conversely, whether the employee would have been discharged "but for" his union activity, *NLRB v. Ayer Lar Sanitarium, supra,* 436 F.2d at 50; *Southwest Latex Corp. v. NLRB,* 426 F.2d 50, 54–55 (5th Cir. 1970). Other cases have stated that the major or dominant reason for the discharge must have been the illegal one, *NLRB v. Plumbers & Pipefitters Local 38,* 388 F.2d 679, 680 (9th Cir. 1968); *NLRB v. Fibers Int'l Corp.,* 439 F.2d 1311, 1312, 1315 (1st Cir. 1971); still other cases employ language largely indistinguishable from the dominant reason test. *See NLRB v. Fibers Int'l Corp., supra,* 439 F.2d at 1315. All of the formulations contemplate that the proscribed motive must play a substantial role in the termination decision.

264, 66 S.Ct. 574 [at 579]. See also *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 377–379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 561–566, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

*Zenith Corp. v. Hazeltine, supra,* 395 U.S. at 123–24, 89 S.Ct. at 1576. *See also Momand v. Universal Film Exchanges, Inc., supra,* 172 F.2d at 42.

■ There is an exact parallel between the problem faced by a plaintiff attempting to show that lost profits resulted from anti-competitive activity rather than from other factors affecting the business, and the problem faced by the Meads in attempting to prove their business losses were traceable to the Union's picketing. The Meads offered evidence that before the picketing began their business was an established and profitable one, that the picketing interfered with deliveries of merchandise to their store, that the work and expense required to operate the store increased, that the volume of business declined, and that the business became unprofitable. In this case, as in *Zenith Corp. v. Hazeltine, supra,* 395 U.S. at 125, 89 S.Ct. at 1577, "the injury alleged . . . was precisely the type of loss that the claimed violations . . . would be likely to cause. The trial court was entitled to infer from this circumstantial evidence that the necessary causal relation between the [Union's] conduct and the claimed damage existed. See *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696–701, 82 S.Ct. 1404, 1409–1411, 8 L.Ed.2d 777 (1962)." Thus, there was sufficient evidence in this case from which the court could conclude that the Union's strike and picketing "materially contributed" to the Meads' losses.

The Union's second objection to the treatment of causation by the trial court, however, seems to us to have merit. As noted earlier, the Union's bargaining demand was that the Meads accede to a master agreement covering the whole gamut of terms and conditions of employment, including wages, a health and welfare plan, a pension plan, a union security clause, and so on. The demonstrator clause was only one term of this proposed agreement. It is not contended that any of the other terms were illegal. No part of the proposal had been agreed to when negotiations reached an impasse. The strike and picketing ensued. The district court found that one of the Union's objectives was to obtain the "demonstrator clause," but that the Union had other lawful objectives; that the consequences of the Union's unlawful objective and lawful objectives were not separable; and that the resultant picketing was a single inseparable course of action. The court further found that the picketing proximately damaged the Meads' business by causing loss of business and profits, and awarded damages to compensate the Meads for this loss. The premise of the award, therefore, was that the Meads were entitled to recover the entire loss from the picketing because the picketing had an unlawful secondary purpose, even though the picketing also had lawful primary purposes.

The Union argues that this requires it to pay damage for injury resulting from lawful primary picketing, a result barred by *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1964), and *Local 20, Teamsters, etc. v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). As the Meads point out, however, the cited cases hold only that where a union has engaged in both lawful and unlawful conduct, and the consequences of those activities are separable, the Union is liable under section 303 only for injuries proximately caused by the illegal activity. *United Mine Workers v. Gibbs, supra,* 383 U.S. at 731–32 & n. 17, 86 S.Ct. 1130; *Teamsters Local 20 v. Morton, supra,* 377 U.S. at 261–62, 84 S.Ct. 1253.[8]

---

8. In view of the decision in *Teamsters Union v. Morton,* the Meads can derive no support from this court's earlier decision in *Carpenters* *Local 131 v. Cisco Constr. Co.,* 266 F.2d 365, 369–70 (9th Cir. 1959).

In this case, however, the consequences are not separable, and the damages cannot be apportioned.

In such a case it is impossible to wholly satisfy "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). If damages are awarded for the injury, the right guaranteed by sections 7 and 13 of the National Labor Relations Act, 29 U.S.C. §§ 157, 163, to engage in concerted activities, and, specifically, to strike, to achieve primary objectives, is impaired. On the other hand, if damages are not awarded to those actually injured, the section 303 remedy provided by Congress to deter unlawful secondary activity and compensate its victims is entirely defeated.

■ The rules of causation imported into the statutory scheme through the "by reason of" language of section 303 afford a means of dealing with at least the extremes of the problem. The requirement that the unlawful objective must have "materially contributed" to the loss or have been a "substantial factor" in bringing it about, will prevent windfall recoveries by employers negligibly affected by a violation, and protect the union's right to strike for primary objectives where such objectives, standing alone, would have caused the strike, but the unlawful objective, standing alone, would not. Restatement (Second) of Torts § 432; W. Prosser, Law of Torts § 41, at 238–40 (4th ed. 1971); 2

F. Harper & F. James, Torts § 20.3, at 1121–23 (1956). On the other hand, a relatively relaxed standard of proof, allowing recovery on evidence supporting "a just and reasonable inference," more likely true than not, that the employer was damaged because of picketing or other union pressure will assure recovery in most cases in which the unlawful motivation was a significant factor producing the union pressure.[9]

Since the district court's judgment rested upon the premise that the injury was compensable simply because the picketing was motivated in part by the Union's unlawful secondary purpose, the judgment must be set aside and the case remanded for appropriate findings as to causation, and for entry of a new judgment.

### III

The trial court declined to award the Meads counsel fees expended in this section 303 action, but did include $750 to reimburse them for attorney fees incurred in the unfair labor practice proceedings before the Board and the Court of Appeals.

In arguing that no attorney fees of any kind may be recovered, the Union relies primarily on a footnote in *Teamsters Local 20 v. Morton, supra,* reading:

> In the Senate debate on the bill, Senator Taft said, " . . . I see no reason why suits of this sort should not be permitted to be filed. After all, it is only to restore to people who lose something because of boycotts and jurisdictional strikes the money which they have lost." 93 Cong.Rec. 4858. Later, in response to Senator Morse's claim that § 303 would impose virtual-

---

**9.** Even when the employer is unable to establish that the unlawful secondary motive is a substantial cause of the coercive activity by the union, the employer is not remediless. Section 8(b)(4)(A) is violated if the secondary clause is "an object" of a strike, (*NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 689, 71 S.Ct. 943 (1951)); and, as the earlier unfair labor practice proceeding involving this dispute demonstrates, the presence of mixed motives does not bar relief in the form

of a Board cease-and-desist order issued under § 10(c) of the Act, 29 U.S.C. § 160(c). Moreover, in appropriate cases, a court injunction may issue under § 10(*l*), 29 U.S.C. § 160(*l*).

Unlike the award, or threat, of damages equitable relief does not interfere with the exercise of the protected right to strike for primary objectives since the order ·or decree can be directed solely against the unlawful demand.

ly unlimited liability, Senator Taft said, "Under the Sherman Act the same question of boycott damage is subject to a suit for damages and attorneys' fees. In this case we simply provide for the amount of actual damages." 93 Cong.Rec. 4872–4873. 377 U.S. at 260 n. 16, 84 S.Ct. at 1259. This footnote and the Supreme Court's recent decision in *Alyeska Pipeline Service Co. v. Wilderness Society,* 240 U.S. 421, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), preclude reimbursement for attorney fees spent in the section 303 action itself. "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Id.* at 247, 95 S.Ct. at 1616. "[A]bsent statute or enforceable contract, litigants pay their own attorneys' fees." *Id.* at 257, 95 S.Ct. at 1621. *See also Bryant Air Conditioning & Heating Co. v. Sheet Metal Workers, Local 541,* 472 F.2d 969, 972 (8th Cir. 1973), and cases there cited.[10]

■ The language of the footnote does not clearly prohibit recovery of attorneys' fees incurred in the prior unfair labor practice proceeding. Senator Taft's reference to the provision for recovery of damages "under the Sherman Act" was to the treble damage section of the Clayton Act, 15 U.S.C. § 15, permitting recovery of the "cost of suit, including a reasonable attorney's fee," with respect to the treble damage action itself. Rejection of the Sherman Act approach does not necessarily imply that *other* attorney fees could not constitute an element of the damages awarded in the section 303 suit. Further, recovery of attorney fees incurred in the unfair labor practice proceedings would involve no question of causation since these fees were incurred specifically and solely because of the Union's insistence upon the demonstrator clause. Moreover, several courts have permitted recovery, in suits under section 303, of attorney fees incurred in related unfair labor practice proceedings.[11] Nevertheless, we think the award of such fees in this case must be set aside.

The earliest case awarding such attorneys' fees simply asserts that fees paid "to bring about the removal of the picket line . . . are proper items of damage." *Teamsters Local 984 v. HumKo Co.,* 287 F.2d 231, 243 (6th Cir. 1961). Subsequent cases simply cite the prior decisions, adding nothing to the rationale.

It is not explained, and is not apparent, why the stated reason distinguishes any case in which the plaintiff prevails in prior litigation against the defendant related to the same wrong. The general rule is that in such situations attorneys' fees in the prior action are not recoverable in a subsequent suit. Expenses of prior litigation, including attorneys' fees, may be recovered where, because of a defendant's wrongful conduct, the plaintiff was forced to prosecute or defend an action involving a third party. But attorneys' fees may not be recovered where the prior litigation involved the same parties, especially when the earlier action was instituted by plaintiff to secure redress for defendant's wrongful conduct. "[W]here an action based on the same wrongful act has been prose-

---

10. Judgments awarding attorneys' fees incurred in § 303 actions were affirmed in *International Longshoremen's Union v. Juneau Spruce Corp.,* 189 F.2d 177, 181 (9th Cir. 1951), aff'd 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952), and *International Longshoremen's Union v. Hawaiian Pineapple Co.,* 226 F.2d 875, 886–87 (9th Cir. 1955), but this element of the award was not questioned on appeal in either case.

11. *See, e. g., Refrigeration Contractors, Inc. v. Plumbers & Pipefitters Local 211,* 501 F.2d 668, 671 (5th Cir. 1974); *Mason-Rust v. Laborers' Local 42,* 435 F.2d 939, 948 (8th Cir. 1970); *H. L. Robertson & Associates, Inc. v. Plumbers Local 519,* 429 F.2d 520, 522 (5th Cir. 1970); *Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co.,* 384 F.2d 101, 109–10 (5th Cir. 1967); *Gulf Coast Bldg. & Constr. Trades Council v. F. R. Hoar & Son, Inc.,* 370 F.2d 746, 748 (5th Cir. 1967); *Teamsters Local 984 v. HumKo Co.,* 287 F.2d 231, 243 (6th Cir. 1961). *Cf. Plumbers & Fitters, Local 761 v. Matt J. Zaich Constr. Co.,* 418 F.2d 1054, 1059 (9th Cir. 1969).

cuted by the plaintiff against the defendant to a successful issue, he can not in a subsequent action recover, as damages, his costs and expenses in the former action." *Ritter v. Ritter,* 381 Ill. 549, 46 N.E.2d 41, 44 (1943). As Professor McCormick put it, "Obviously a party who wins a lawsuit cannot escape the rule that expenses of litigation beyond taxable costs are not recoverable by merely instituting a new suit for such expense in the first case." C. McCormick, Damages § 67 at 249 (1935). *See generally id.* §§ 66–68; 25 C.J.S. Damages § 50e; 22 Am.Jur.2d Damages § 165.

It would be particularly inappropriate to depart from the general rule in a case such as this. The Board has adhered to the general "American Rule" that the prevailing party's attorneys' fees are not ordinarily recoverable from the losing party. *Heck's, Inc.,* 191 N.L.R.B. 886, 889 n. 19 (1972), *modified and enforced, Food Store Employees Local 347 v. NLRB,* 139 U.S.App.D.C. 383, 476 F.2d 546 (1973), *reversed on other grounds, NLRB v. Food Store Employees, Local 347,* 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974). The Board recently reasserted its adherence to this general rule but held that the charged party may be required to reimburse the charging party's expenditure for attorneys' fees and other costs of litigation if the charged party's defense before the Board is frivolous or in bad faith. *Tiidee Products,* 194 N.L.R.B. 1234, 1236–37 (1972), *modified and enforced, International Union of Electrical Workers v. NLRB,* 163 U.S.App.D.C. 347, 502 F.2d 349 (1974); *see generally NLRB v. Food Store Employees, Local 347, supra,* 417 U.S. at 3–8, 94 S.Ct. 2074.[12] If attorneys' fees incurred in Board proceedings could be recovered in every case by subsequent section 303 action, it would circumvent the Board's rule allowing recovery of such fees only where the defense is frivolous or in bad faith. This case illustrates the point. In its present posture, the only portion of the judgment that could be sustained constitutes an award of precisely those attorneys' fees that the Board (and the Court of Appeals) would not make. Such a rule would also interfere with the Board's exercise of its "broad discretion to order a violator 'to take such affirmative action . . . as will effectuate the policies of [the Act].' 29 U.S.C. § 160(c)." *NLRB v. Food Store Employees, supra,* 417 U.S. at 8, 94 S.Ct. at 2079. It is for the Board, not the courts, to determine whether the conflicting interests are best resolved by imposing litigation costs upon the defeated party before the Board. *Id.* at 8–9, 94 S.Ct. 2074.

Finally, the determination of whether a union's conduct violates section 8(b)(4) may be made either by the Board, as in this case, or by the court in a suit under section 303. *International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.,* 342 U.S. 237, 243–45, 72 S.Ct. 235 (1952); *Plumbers & Fitters, Local 761 v. Matt J. Zaich Construction Co.,* 418 F.2d 1054, 1057–58 (9th Cir. 1969). If there had been no prior Board proceedings and the illegality of the clause had been established in this action, the Meads could not have recovered the attorneys' fees attributable to that incremental effort. The result should be no different because this essential element was established in a separate proceeding before the Board.

The judgment in 72–3043 is reversed and remanded for further proceedings. The judgment in 72–3044 is affirmed.

12. The inherent power to award attorney fees under such exceptional circumstances has been recognized in the federal courts, and its exercise is not thought to be inconsistent with the general rule that the prevailing party cannot recover such fees. *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, at 258–60, 95 S.Ct. 1612, at 1622–23, 44 L.Ed.2d 141 (1975); *International Union of Elec. Workers v. NLRB,* 502 F.2d 349, 356 n. 22 (D.C.Cir.1974).