# United States Court of Appeals
## For the First Circuit

No. 00-1522

INTERCITY MAINTENANCE COMPANY,

Plaintiff, Appellant,

v.

LOCAL 254, SERVICE EMPLOYEES INTERNATIONAL UNION;
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO;
VICTOR LIMA AND DONALD COLEMAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Stahl, Circuit Judge.

Vincent F. Ragosta Jr., with whom Matthew T. Oliverio and Christine M. Curley were on brief, for appellant.
John B. Lawlor Jr., with whom Daniel V. McKinnon and Dean J. Wagner were on brief, for appellees Local 254, Victor Lima and Donald Coleman.
Steven K. Hoffman, with whom Richard M. Peirce, Adam C. Robitaille and Christy Hoffman were on brief, for appellee Service Employees International Union.

**COFFIN, <u>Senior Circuit Judge</u>.** This case stems from a labor dispute in which local union officials used heavy-handed tactics in an attempt to unionize a company. Appellant Intercity Maintenance Company (Intercity), a non-union janitorial service, sued the Service Employees International Union (SEIU), its local affiliate (Local 254), and two of the affiliate's officers, Victor Lima and Donald Coleman, for unlawful secondary activity in violation of § 303 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 187, and a variety of state tort claims, two of them alleging defamation. Summary judgment was granted to the SEIU and Lima on all counts, and to Coleman on all but the defamation claims. Local 254 went to trial on the federal claim and, along with Coleman, on the two remaining state law counts for defamation. After the close of the plaintiff's evidence, the court in a bench ruling granted defendants' Rule 50 motion for judgment as a matter of law on the three outstanding counts. We affirm the summary judgment in all respects and the Rule 50 judgment on the defamation claims, but remand the LMRA claim for retrial.

We are in full agreement with the district court's convincing resolution of the summary judgment issues and adopt its reasoning as articulated in its published opinion. See Intercity Maint. Co. v. Local 254 Serv. Employees Int'l Union, 62 F. Supp. 2d 483 (D.R.I. 1999). We therefore focus our review on the Rule 50 judgment granted at trial. Our brief recitation of the pertinent facts is culled from the district court's ruling, as well as relevant trial testimony, and presented in the light most favorable to Intercity. See Russo v. Baxter Healthcare Corp., 140 F.3d 6, 8 (1st Cir. 1998).

## Background

Intercity provided janitorial services to Women and Infants Hospital (Women & Infants) and Blue Cross/Blue Shield (Blue Cross) in Providence, Rhode Island, since 1989 and 1990, respectively. Beginning in late 1994, Local 254, acting through its director of organizing, Coleman, and his assistant, Lima, made repeated attempts to persuade Intercity to unionize its eighty employees and let Local 254 be their collective bargaining representative. Intercity President Michael Bouthillette rebuffed these overtures, refusing to sign the proposed collective bargaining agreement because, he said, it was up to his workers, not him, to decide whether to unionize.

-3-

In January and February 1995, Lima repeatedly warned Bouthillette to sign the collective bargaining agreement, or else Local 254 would drive Intercity out of business by picketing in front of its two major customers, Women & Infants and Blue Cross.[1]  On March 28th, Coleman reiterated this threat to Blue Cross attorney Gary St. Peter, who testified that Coleman had told him he would throw up a picket line in front of Blue Cross "whether . . . it's illegal or not."

On March 20, 1995, Coleman sent two letters to Blue Cross's director of facilities management, John Leite, who was in charge of procuring janitorial services.  The first letter, addressed to Bouthillette and copied to Leite, accused Intercity of violating federal and state laws and regulations in handling hazardous substances, and demanded information about Blue Cross's ventilation system.  The second letter, sent the same day directly to Leite, requested the same information from Blue Cross.

On May 5th, Blue Cross put its cleaning services contract out to bid, and Intercity lost it to a unionized bidder.  Bouthillette testified that the bid Intercity

---

[1]  The threats made against Bouthillette personally were such that the Rhode Island Superior Court granted him a temporary restraining order, enjoining Lima from contacting him or his family.

submitted, $6,597 per month, was the same price it had charged since 1990 when it first started the Blue Cross account. Bouthillette also testified that Leite had told him "we're going to go with the union contractor, and if you can resolve things with [Local 254], there's a good chance you'll get [the contract] back, but if not . . . . if you don't, there's not much of a chance." At one point, Lima told Bouthillette that Local 254 no longer wanted to organize his workers; it just wanted to drive Intercity out of business. By August 1995, Intercity was no longer servicing Blue Cross.

Local 254 did not limit its interference with Intercity's customers to Blue Cross. On March 31, 1995, Local 254 began a week-long picket line outside of Women & Infants, distributing printed handbills that contained grave accusations, including false references to Intercity not providing health insurance or holiday pay to its employees and paying less than the prevailing wage. In fact, Intercity did provide those benefits and paid its employees more than the union wage contemplated in the proposed collective bargaining agreement. Bouthillette testified that his contact at Women & Infants, Mark Neal, told him on the day picketing started, "We can't have this here . . . . We'll do what we have to do, but this doesn't look very good for you in the future." Nearly two years later, in

1997, Intercity lost the contract for three buildings at Women & Infants, but continued to perform services at seven others.

The original complaint, filed in 1995, alleged the LMRA claim along with state tort causes of action and was amended in 1997 to add separate counts for defamation involving Blue Cross (Count IV) and Women & Infants (Count V).  As we have noted, only the LMRA claim against Local 254, and the defamation claims against Local 254 and Coleman, went to trial.

At trial, Bouthillette testified that Intercity suffered pecuniary damage not only from losing the accounts, but also from defendants besmirching its reputation, which diverted Bouthillette from developing new business due to the inordinate amount of time he spent reassuring customers that they would not be targeted for picketing.  Plaintiff also introduced into evidence an accounting report, which quantified Intercity's loss from the Blue Cross account at roughly $30,000 per year.

In a bench ruling issued at the close of the plaintiff's evidence, the court granted defendants' Rule 50 motion on all three claims.  It held the evidence in support of Intercity's LMRA claim insufficient as a matter of law because, even if Local 254's actions were proscribed illegal secondary activity (which was assumed for purposes of the decision), Intercity failed to show how that activity caused it to lose the

Blue Cross and Women & Infants accounts. As for the two defamation counts, the court held that, although the evidence of knowing or reckless false statements was "overwhelming," Intercity presented "no evidence that the plaintiff lost business at Blue Cross or at Women & Infants as a result of the defamation."

Appellant argues that it presented sufficient evidence on both fronts to reach the jury. On the LMRA claim, appellant asserts that the jury should have been afforded an opportunity to find that Intercity lost both the Blue Cross and Women & Infants accounts due to Local 254's illegal interference. On the defamation claims, appellant argues that it did not need to present evidence to prove damages and, even if it did, its proof on damages was sufficient. It also assigns error to the court's refusal to admit evidence of Local 254's assets in support of a claim for punitive damages.

We review Rule 50 challenges to the sufficiency of evidence presented at trial de novo, affirming entry of judgment as a matter of law "only if there 'is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving party].'" Tang v. Rhode Island Dep't of Elderly Affairs, 163 F.3d 7, 11 (1st Cir. 1998) (quoting Fed. R. Civ. P. 50(a)(1)). When judgment is entered before the jury is called

upon to render its verdict, we examine the legal sufficiency of the evidence in the light most favorable to the non-moving party, and require more than a mere scintilla of evidence or speculation to justify the submission of an issue to the jury. Id. And, of course, we must ensure that the trial court has refrained from making credibility determinations or weighing the evidence.

## Discussion

Appellant challenges the court's Rule 50 judgment, arguing that its claims of unlawful secondary activity and defamation should have gone to the jury. We agree, in part. As for the LMRA claim, we conclude that the evidence linking Intercity's loss of the Blue Cross account to Local 254's interference was sufficient to merit consideration by a fact finder, but the evidence of losses attendant to the union's activities at Women & Infants was inadequate as a matter of law, particularly because that account was not terminated until almost two years later. As for the defamation claims, Intercity failed to introduce more than a scintilla of evidence of reputational harm or other specific damages. Accordingly, we remand the LMRA claim for trial, limited to liability for, and damages stemming from, Intercity's loss of the Blue Cross

-8-

account, and affirm the district court's judgment on the defamation claims.

## Unlawful Secondary Activity

Section 8(b) of the LMRA makes it an unfair labor practice for unions to threaten, coerce, or restrain a company by forcing it to cease doing business with another company. See 29 U.S.C. § 158(b)(4)(ii)(B).[2] Direct efforts to pressure an employer with whom a union has a dispute are acceptable, but indirect efforts to pressure a secondary employer are unfair labor practices. Abreen Corp. v. Laborers' Int'l Union, 709 F.2d 748, 754-55 (1st Cir. 1983). Here there was no dispute that Blue Cross was a secondary employer. Coleman, acting on behalf of Local 254, threatened to picket Blue Cross unless it ceased doing business with Intercity, a threat made not only to Bouthillette, but repeated to his attorney and the attorney for

---

[2] "(b) It shall be an unfair labor practice for a labor organization or its agents--
  (4) (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
  (B) forcing or requiring any person to cease . . . doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ." 29 U.S.C. § 158.

Blue Cross. The district court recognized this as "epitomiz[ing] the classic description of coercion within the labor law context." Intercity, 62 F. Supp. 2d at 496 ("The evidence presented by plaintiff is not subtle; it reveals a transparent intention by Local 254 to pressure Blue Cross improperly.").

Despite this strong evidence of Local 254's improper secondary activity, the court did not let the claim go to the jury. It entered judgment for Local 254 on the ground that Intercity had failed to offer sufficient evidence that it lost the Blue Cross account because of Local 254's unlawful conduct. In analyzing Intercity's loss of the Blue Cross account, the court reasoned:

> There is not one shred of evidence produced at this trial to indicate why Blue Cross elected to put its janitorial contract out to bid. No one from Blue Cross testified. The Court and the jury can draw the inference that the failure of the plaintiff to produce Leite, who was the key man in this area, and probably made the decision, was because his testimony would have been of no value to the plaintiff. The point is that Blue Cross did put all of its janitorial work out to bid. The Plaintiff did bid, and didn't receive the bid and didn't receive the contract. The inference is that the plaintiff was not the low bidder. In any event, there's no evidence from Blue Cross as to why the plaintiff was not chosen. The jury should not be allowed to speculate because it is the plaintiff that has the burden of proof, and it is the plaintiff's obligation to produce witnesses who will support its cause of action. In this case the plaintiff has failed to do so.

This reasoning was in error because the court impermissibly drew negative inferences against Intercity. It inferred that the failure to call Leite "was because his testimony would have been of no value" and that Intercity lost the Blue Cross contract because "plaintiff was not the low bidder." The jury could have reasonably concluded otherwise.

As to the sufficiency of the evidence, the court simply noted that there was no basis for a finding of proximate cause. Neither it nor the parties attempted to give this term further definition. In our own jurisprudence dealing with unlawful activity, we have had three occasions to consider when, in accordance with the statutory wording, damages may be said to have been sustained "by reason of" the illegal activity. 29 U.S.C. § 187(b).[3] But in this case any difference between these

_____

[3] In Abreen, our first such case construing the "by reason of" element, we held that where predominantly secondary activity is at issue, losses traceable to that unlawful union conduct may be recovered. 709 F.2d at 759. Our two subsequent cases, however, invoked a more exacting standard adopted from the Ninth Circuit's decision in Mead v. Retail Clerks Int'l Ass'n, 523 F.2d 1371 (9th Cir. 1975), which held that injury occurs "by reason of" particular unlawful conduct only if that conduct "materially contributes" to the injury or is a "substantial factor" in bringing it about. Id. at 1376; see John B. Cruz Constr. Co., Inc. v. United Bhd. of Carpenters and Joiners, 907 F.2d 1228, 1232 (1st Cir. 1990); Tresca Bros. Sand & Gravel, Inc. v. Truck Drivers' Union, 19 F.3d 63, 65 (1st Cir. 1994). Although we did not explicitly note the distinction, Cruz and Tresca are distinguishable from Abreen because they involved both lawful and unlawful union activity. The Mead rule, and our cases applying it, do not apply where only

-11-

standards is irrelevant, for under either formulation Intercity presented enough evidence at trial to warrant submission to the jury.    Bouthillette testified that Intercity lost its account with Blue Cross, not because it overbid,[4] but because of Local 254's threatened picket.    Blue Cross attorney St. Peter corroborated Bouthillette's testimony about the union's unlawful threat.    Bouthillette further testified that Blue Cross's own procurement officer, Leite, told him that Intercity would likely lose the account if it did not resolve the dispute with the union.[5]  Although plaintiff did not call Leite to testify, the jury was entitled to consider Bouthillette's uncorroborated testimony.    Indeed, assuming favorable and permissible inferences and that Bouthillette was to be believed, there was no other competing cause for Intercity's loss of business.

---

prohibited secondary activity is at issue.

[4]    At trial, defense counsel suggested in his opening statement that Intercity's bid was nearly double the amount to which Bouthillette later testified, and more than that of the unionized bidder who won the contract.  Of course, since the judgment entered before defendants put on their case, they had no opportunity to substantiate this claim.  Because counsel's statement was not evidence, we, like a jury, may not consider it, see, e.g., United States v. Brassard, 212 F.3d 54, 57 (1st Cir. 2000), and therefore must credit Bouthillette's testimony.

[5]    The court admitted this hearsay testimony over an objection and without a limiting instruction.  Neither party takes exception to this ruling on appeal.

Moreover, the timing of events permitted the jury to infer that Intercity's loss was caused by Local 254's conduct. The last readily identifiable unlawful act was Coleman's threat made to attorney St. Peter on March 28th; Blue Cross put its contract out to bid on May 5th. The court foreclosed jury consideration of a permissible inference, i.e., that these two events - which occurred just five weeks apart - were causally related. This it may not do. Because the timing and Bouthillette's testimony, if believed, would have sufficed as a matter of law to prove that Intercity's loss of the Blue Cross account occurred by reason of Local 254's unlawful activity, the LMRA claim should have been decided by the jury.

Intercity's loss of the Women & Infants account, by contrast, is unsupported by such an inference. The nearly two-year gap between Local 254's picketing and leafleting there and Women & Infants's curtailment of its business with Intercity was too attenuated on its own to permit an inference of some causal connection between these events. Bouthillette's testimony that his contact at Women & Infants, Neal, had made a reference to the union activity not boding well for Intercity's future, was too opaque to rise above the scintilla level, especially in light of the timing of adverse action. The district court correctly found the evidence insufficient as a matter of law to

prove Intercity lost any part of the Women & Infants account by reason of Local 254's activity.

### Defamation

Intercity pleaded its defamation claim in two counts, one involving Blue Cross (Count IV) and the other involving Women & Infants (Count V). In support of Count IV, Intercity relied on Coleman's March 20, 1995, letter to Blue Cross's Leite, which announced that "InterCity [wa]s in violation of both Federal and State laws and regulations." Count V alleged defamation from handbills distributed at Women & Infants, which claimed that "INTERCITY expose[d] its cleaners to chemical and biological hazards including HIV and Hepatitis B virus," and that Intercity did not provide certain benefits or pay a living wage. Local 254 made scant effort to investigate the veracity of these charges.

In its summary judgment ruling, the district court correctly found these assertions to be statements of fact, not opinion, requiring a jury to determine whether they were false and made with malice. See Intercity, 62 F. Supp. 2d at 504-05.[6]

---

[6]    The court also rightly noted that certain other statements - characterizing Intercity as a "sweatshop," a "plague," and an "infestation," and Bouthillette as a "bloodsucking, plantation-minded boss" - were non-actionable opinion, "rhetorical hyperbole" typical of labor disputes and protected under the LMRA. Id. at 503.

-14-

As the court stated in its Rule 50 decision, the evidence presented at trial was "overwhelming that those statements were either knowingly false or made with reckless disregard for truth or falsity." The judge remarked, "plaintiff has succeeded in proving that the defendants . . . are lawless, marauding, disingenuous, character assassins who deserve their comeuppance." Despite the strong evidence of malice, however, the court ruled there was "no basis for submitting this cause of action to the jury" because plaintiff failed to "allege and prove specific or special damages."

Relying on Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53 (1966), the court held that Intercity could not rest on the common law presumption of damages, in which the existence of injury is presumed from the fact of publication without evidence of actual loss. See generally Gertz v. Robert Welch, Inc., 418 U.S. 323, 349 (1974); Carey v. Piphus, 435 U.S. 247, 262 & n.18 (1978). Appellant argues that the court misread Linn, and contends in the alternative that it did present sufficient evidence of damages even without the presumption. We agree with the court's reading of the law and view of the evidence.

State tort claims are generally preempted by the LMRA. See San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 243-

-15-

44 (1959). In Linn, the Court carved out an exception to the Garmon preemption rule for defamatory statements made with actual malice, adopting the standard applicable to public officials from New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964) (defining malicious libel as a statement published "with knowledge that it was false or with reckless disregard of whether it was false or not"). See Linn, 383 U.S. at 65; see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 273 (1974); Barss v. Tosches, 785 F.2d 20, 21 (1st Cir. 1986).

In addition to malice, Linn requires "proof of [] harm, which may include general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law." 383 U.S. at 65; accord Belknap, Inc. v. Hale, 463 U.S. 491, 509 (1983); Farmer v. United Bhd. of Carpenters & Joiners, Local 25, 430 U.S. 290, 299 (1977). In explicitly requiring proof of harm, Linn preempts not only non-malicious libels, but also reliance on the common law presumption of damages in those jurisdictions where libel is actionable per se. 383 U.S. at 58 & n.2, 65.[7] Therefore, plaintiffs who endure even

_____

[7] In Rhode Island, a common law action for defamation requires proof of "damages, unless the statement is actionable irrespective of special harm." Swerdlick v. Koch, 721 A.2d 849,

-16-

malicious libels during a labor dispute must present evidence of harm from defamation in order to recover, notwithstanding the law of states such as Rhode Island in which damages would otherwise be presumed. Cf. Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185, 1210-11 (11th Cir. 1999) (Tjoflat, J., dissenting) ("Under federal law, [] a libel action arising out of a labor dispute requires proof of injury, regardless of state libel law." (citing Linn, 383 U.S. at 64-65)).

Under Linn, Intercity could not rest on an unsubstantiated allegation of injury to its reputation. Having correctly concluded that Linn preempted Intercity from relying on the common law presumption of damages, the district court held that the evidence of actual loss due to reputational harm and consequent lost profits was insufficient as a matter of law. We agree that Intercity offered no more than a scintilla of evidence to prove losses stemming from diminished reputation.

859-60 (R.I. 1998). Under the common law rule damages are presumed, and the need to offer evidence obviated, if the defamatory statement is libelous per se. See id. at 861 ("[F]or statements to qualify as libel per se, the publication must impute insolvency, financial embarrassment, unworthiness of credit, or failure in business to a plaintiff, but to make them so it is essential that such imputation relate to or affect the plaintiff in his business.") (internal quotation marks and alterations omitted). Since Intercity presented evidence of harm to its business based on statements that are defamatory on their face, it would have been able to take advantage of the common law presumption of damages if the statements had not been made in the context of a labor dispute.

-17-

However, in its amended complaint Intercity also sought to substantiate its claim for defamation with evidence of specific damages apart from reputation: the loss of the Blue Cross and Women & Infants accounts.

Had appellant shown that it lost the contracts as a result of Coleman's libelous letters or the defamatory handbills, then such proof of a "specific item of pecuniary loss" would have satisfied the damages element required by Linn. 383 U.S. at 65. But Intercity presented no evidence - not even hearsay testimony from Bouthillette - to show the loss of the contracts resulted from Local 254's malicious accusations. The only such testimony related to threats of union retaliation. The evidence in support of specific damages pleaded in Counts IV and V was therefore inadequate to merit jury consideration.

Intercity also argues that it should have been permitted to recover punitive damages and introduce evidence of Local 254's assets in support of that claim. Absent evidence of actual damages, however, no punitive damages may be awarded. See Linn, 383 U.S. at 66 ("[A] defamed party must establish that he had suffered some sort of compensable harm as a prerequisite to the recovery of additional punitive damages."). Because plaintiff failed to present evidence from which the jury could have found that Intercity suffered actual harm due to

defamation, the district court properly refused to admit evidence of punitive damages.

## Conclusion

We remand for retrial Count II of the Amended Complaint, the LMRA claim; in all other respects, the judgment is affirmed.

Affirmed in part, vacated in part and remanded. No costs.