**BOXHORN'S BIG MUSKEGO GUN CLUB, INC., Plaintiff,**

**v.**

**ELECTRICAL WORKERS LOCAL 494, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Local 494 International Brotherhood of Electrical Workers, AFL–CIO, Its Officers and Members, et al., Defendants.**

**No. 79–C–609.**

United States District Court, E.D. Wisconsin.

Oct. 11, 1985.

Thomas P. Krukowski, Krukowski, Chaet, Beck & Loomis, Milwaukee, Wis., for plaintiff.

David Leo Uelmen, Goldberg, Previant, Uelmen, Milwaukee, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

Plaintiff, Boxhorn's Big Muskego Gun Club, Inc. ("Boxhorn") commenced this action on August 2, 1979, alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976) and Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187 (1976). Named as defendants were various labor unions and individuals associated therewith. On December 10, 1982, the Court dismissed Boxhorn's Sherman Act claims and on January 25, 1983, the Court dismissed the individual defendants from this action. The remaining issues were tried to this Court on May 23–27, 1983. The following constitutes the Court's Findings of Fact and Conclusions of Law.

### I. Background

Dick and Lois Bennett purchased Boxhorn in 1971. Boxhorn is a trapshooting facility and retail store providing trapshooting equipment and supplies. The facility consists of numerous trap fields, a clubhouse, a recreation area and a restaurant and tavern. Boxhorn patrons participate in recreational and competitive trapshooting throughout the year.

Boxhorn's business rapidly grew in the seventies necessitating an expansion of facilities. On two separate occasions, in 1974 and again in 1978, the Bennetts expanded Boxhorn's facilities to accommodate the increased business. The 1978 expansion consisted of remodeling and expanding Boxhorn's restaurant, tavern and clubhouse. To perform this project, the Bennetts employed Gerald Glancey as general contractor who performed most of the carpentry work, but who subcontracted certain other work. A portion of this subcontracted work was performed by nonunion contractors who had union contractor competitors.

Glancey and the subcontractors used their own tools and materials in performing the construction. Boxhorn paid Glancey on a lump-sum basis and these payments contained no deductions for taxes, social security or worker's compensation. Upon re-

ceiving payment for services rendered, Glancey and the subcontractors gave lien waivers to Boxhorn. Boxhorn employees did not perform any construction work and it was not involved in hiring or firing any employees of Glancey or the subcontractors. It is clear that there was not an employer/employee relationship between Boxhorn and Glancey or between Boxhorn and any of the subcontractors.

One of the nonunion subcontractors was Durski Electrical Contractors Co., Inc. ("Durski"). In early July, 1978, Durski's electrical work on the expanded clubhouse was nearly complete when Ralph Gondek, business agent for the International Brotherhood of Electrical Workers, Local 494, met with Mr. Bennett and requested that he use only union labor. Bennett refused this request. At that time construction work on the clubhouse was nearly completed and work had begun on the tavern-restaurant.

Subsequent to this meeting, Gondek orchestrated a public appeal by the Milwaukee County Labor Council (MCLC) and the Milwaukee Building Construction Trades Council (MBCTC) to not patronize Boxhorn. Gondek was on the MCLC Board and was a delegate to MCLC and MBCTC. This public appeal concerned the nonunion electrical work performed by Durski at the Boxhorn construction project. The apparent purpose was to force Boxhorn to cease doing business with Durski and, instead, to employ union electrical contractors. The dispute centered entirely upon Durski's nonunion status. Thus, the dispute was between Durski and the defendant.

The defendants took other actions to force Boxhorn into using only union contractors on its expansion project. First, on July 17, 1978, MCLC prematurely ended its trapshooting league at Boxhorn. Second, on July 19, 1978, Boxhorn was indefinately placed on MCLC's "Do Not Patronize" list which requested that union affiliated persons cease patronizing Boxhorn. Finally, MCLC sent Mr. Bennett a letter stating that none of its members would patronize Boxhorn until it complied with their re-

quest. These tactics failed to influence the Bennetts.

The defendants then undertook bolder methods of influence. During portions of four days in late July or early August, 1978, Gondek, along with three other persons, distributed approximately 2,000 handbills to Boxhorn patrons at the club entrance. The handbills read as follows:

### PLEASE DO NOT PATRONIZE BIG MUSKEGO GUN CLUB

The Milwaukee County Labor Council has withdrawn 42 teams in protest against Mr. Bennett's decision to use non-union construction workers.

Our request to use **Union Workers** was scoffed at by Mr. Bennett.

You can help by withdrawing your team from Big Muskego Gun Club.

Electricians Local Union 494 IBEW

The handbill distribution process consisted of one of the above-mentioned distributors positioning himself at the Boxhorn entrance thereby forcing an incoming vehicle to slow down or to stop. The distributor would then approach the driver's side of the vehicle holding a handbill and conveying his intention to offer it to the driver. Upon accepting or refusing the handbill, the driver could proceed through the Boxhorn entrance unhindered.

The defendant published the handbill in the July-August edition of its newspaper. Furthermore, a picture of the handbill held by the defendants' agents appeared in the August 24, 1978 edition of the AFL–CIO Milwaukee labor press. These publications reached approximately 200,000 persons.

The parties dispute whether picketing occurred in conjunction with the handbilling. At trial, plaintiff presented four disinterested witnesses who testified that they observed picketing and the posting of picket signs at the Boxhorn entrance where the aforedescribed handbilling occurred. However, defendants presented one disinterested witness who testified that he did not observe any picketing or the display of picket signs on the days when handbilling

occurred. The persons who conducted the handbilling also testified that no picketing transpired.

Boxhorn alleges that it suffered substantial monetary loss directly resulting from decreased business pursuant to defendants' successful dissuasion of Boxhorn patronization. Boxhorn alleges that this dissuasion constituted unlawful secondary activities and that defendants should be held liable for the resulting damages. Defendants assert that their activities were protected by the publicity proviso to 29 U.S.C. § 158(b)(4). For the reasons stated below, the Court finds that the defendants' activities violated 29 U.S.C. § 158(b)(4) and were not protected by the publicity proviso.

### II. Whether Boxhorn Was A Primary Or Secondary Employer

■ Boxhorn's cause of action is based on 29 U.S.C. § 158(b)(4) (1976). This section restricts a labor organization and its agents from using economic pressure where an object of it is to force an employer or other person to boycott someone else. *NLRB v. Denver Bldg. Council,* 341 U.S. 675, 687, 71 S.Ct. 943, 950, 95 L.Ed. 1284 (1950). This proscribed tactic is labeled a "secondary boycott." Thus, a union is prohibited from striking or boycotting, or attempting to induce or encourage such action, "against employer A for the purpose of forcing that employer to cease doing business with employer B" with whom the union is engaged in a dispute. *Id.* Employer A is termed the "secondary employer" and employer B is termed the "primary employer."

■ In its post-trial brief, defendants imply that Boxhorn was a primary employer since non-union contractors were hired to construct its expansion project. Defendants' failure to steadfastly pursue this contention is warranted. The holding in *Denver Building, supra,* compels finding that Boxhorn was a secondary employer. That case involved a dispute between a union and a subcontractor at a construction site. The union engaged in a strike to force the site's general contractor to terminate its contract with the subcontractor. The Su-

preme Court found that such action was unlawful secondary activity since the general contractor was a secondary employer.

The instant case presents even stronger reasons for finding that the union conducted secondary activities. In *Denver Building* the subcontractor was the primary employer and the general contractor was the secondary employer. The present case similarly involves a general contractor/subcontractor relationship and the union's dispute is with the subcontractor. However, the object of the union's activities is not the general contractor (Glancey), rather it is Boxhorn. Therefore, the nexus between the dispute and the union's activities is more remote than in *Denver Building*. Moreover, Boxhorn lacked any supervisory control over Durski. The Court therefore finds that Boxhorn was a secondary-neutral employer and it will proceed to determine whether the defendants' activities directed against Boxhorn were unlawful.

### III. The Legality of Defendants' Activities

#### A. Whether Defendants' Activities Constituted Coercion

■ Section 8(b)(4)(ii)(B) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(b)(4)(ii)(B) (1976), prohibits coercion where the purpose thereof is to force or require any person "to cease doing business with any other person." By handbilling, publishing a copy of the handbill, picketing (discussed *infra*) and placing Boxhorn on its "Do Not Patronize" list, defendants advocated a consumer boycott of Boxhorn. As stated above, these activities were undertaken to force Boxhorn into terminating the use of non-union subcontractors on its expansion project. This Court finds that the defendants' actions constituted coercion within the broad scope of 29 U.S.C. § 158. *Building Trades Council (DeBartolo Corp.)*, 273 N.L.R.B. 172 (1985); *Edward J. DeBartolo Corp. v. NLRB*, 662 F.2d 264, 271, (4th Cir.1981), *rev'd on other grounds*, 463 U.S. 147, 103 S.Ct. 2926, 77 L.Ed.2d 535 (1982); *see, Longshoremen v. Allied International,*

*Inc.*, 456 U.S. 212, 225, 102 S.Ct. 1656, 1664, 72 L.Ed.2d 21 (1981).

#### B. Whether Defendants Are Protected By The Publicity Proviso

Initially, the Court must resolve Boxhorn's contention that defendants are precluded from asserting the protection of the publicity proviso because they failed to plead such protection as an affirmative defense. Boxhorn relies on *NLRB v. Teamsters, Local 126*, 435 F.2d 288 (7th Cir.1970) wherein the Seventh Circuit found that the existence of an "ally relationship" is an affirmative defense which the unions had the burden of proving. Boxhorn cites no precedent that labels the publicity proviso an affirmative defense. Similarly, the Court is unaware of any requirement, either precedential or statutory, that a defendant must plead the protection of the publicity proviso. The Court will impose no such requirement in this case.

■ Defendants contend that their activities are exempted from 29 U.S.C. § 158(b)(4) pursuant to the publicity proviso contained therein. Defendants are protected by the proviso if the following factors were present.

(1) Defendants' actions constituted publicity other than picketing;

(2) there was a producer-distributor relationship between the non-union subcontractors and Boxhorn;

(3) the publicity was truthful; and

(4) the effect of the publicity did not result in the interference with deliveries or work stoppage of any employees of any person other than those employed by the employer with whom the union has a primary dispute.

It is undisputed that the fourth factor existed. Thus, analysis of the remaining three factors must be undertaken.

#### 1. Picketing

At trial, Boxhorn presented four witnesses who testified that they observed picketing at the Boxhorn entrance on the days when defendants' agents were present

there. From a distance, these witnesses observed individuals pacing at the Boxhorn entrance while holding picket signs approximately 18″ by 20″ in size. One witness testified that the signs stated "AFL–CIO, Job Action, Local 494." These witnesses were disinterested and indeed some of them were members of unions other than the defendants. The Court considers such testimony highly credible.

The defendants presented testimony supporting their position that they did not picket. One witness, Mr. Leo Bednarski, testified that he observed no picketing at the Boxhorn entrance on the four days when defendants' agents were handbilling. However, Mr. Bednarski did not testify that he constantly observed the defendants' agents the entire time that they were present at the Boxhorn entrance. The Court finds Mr. Bendarski's testimony credible. Furthermore, at trial the defendants' handbillers testified that no picketing occurred at the Boxhorn entrance.

Analyzing conflicting credible testimony to ascertain a factual finding is an extremely difficult task. Defendants urge the Court to discredit the testimony of Boxhorn's four disinterested witnesses because of various tangential inconsistencies in their accounts. The Court is not persuaded. It is more likely that these apparent inconsistencies exist because the observations occurred at different times; persons' perceptions and subsequent descriptive accounts thereof naturally differ as to minor details; and over time peoples' memories of minor details become blurred.

The Court finds that the defendants did perform picketing at the Boxhorn entrance. There may not have been constant picketing during defendants' presence at the Boxhorn entrance, however some picketing did occur.

### 2. Producer-Distributor Relationship

Defendants assert that there existed a producer-distributor relationship between Durski and Boxhorn. That is, the labor performed by Durski composed a portion of the final product—trapshooting—which Boxhorn distributed, thereby establishing the relationship. Defendants' position is on firm ground. Circumstances similar to the present existed in *Edward J. DeBartolo Corp. v. NLRB,* 463 U.S. 147, 103 S.Ct. 2926, 77 L.Ed.2d 535 (1982). That case involved a building contractor who was retained to construct a department store in a shopping center. There, plaintiff conceded that the department store was a distributor of products produced by the contractor. However, the Supreme Court stated in dicta that "[i]ndeed, we may assume here that the [publicity] proviso's coverage ... is broad enough to include almost any primary dispute that might result in prohibited secondary activity." *DeBartolo,* 463 U.S. at 155, 103 S.Ct. at 2932. This dicta carries the strong implication that the Supreme Court would have found a producer-distributor relationship regardless of the plaintiff's concession. Moreover, *International Brotherhood of Teamsters, Local 537 (Lohman Saks Co.),* 132 N.L.R.B. 901 (1961), cited by the Supreme Court in conjunction with this dicta supports this position.

The Court finds that a producer-distributor relationship existed between Durski and Boxhorn.

### 3. Handbills' Truthfulness

█ Boxhorn alleges that the handbills distributed by defendants were untruthful within the meaning of the publicity proviso since they failed to identify Boxhorn's true relationship to the primary dispute. Defendants contend that absent an intent to deceive or a substantial departure from fact, a handbill failing to identify the primary employer by name does not lose its publicity proviso protection.

There appears to be a dispute between the Fourth and Ninth Circuits as to whether handbills distributed at the secondary employer's premises must state the secondary employer's relationship to the primary dispute. The Court is aware of no Seventh Circuit pronouncement on this matter. In *Edward J. DeBartolo v. NLRB,* 662 F.2d 264, 268, (4th Cir.1981), *rev'd on other grounds,* 463 U.S. 147, 103 S.Ct. 2926, 77

L.Ed.2d 535 (1982), the Fourth Circuit held that omission in the handbill of the secondary employer's relationship to the primary dispute is, standing alone, not evidence of the union's intent to deceive. There must also be an intent to deceive and a substantial departure from fact. To the contrary, the Ninth Circuit in *Hospital & Service Employees Union v. NLRB*, 743 F.2d 1417 (9th Cir.1984) found that the publicity proviso requires that publicity advise the public of the primary dispute's nature and the secondary employer's relation to it. In that case, handbills solely urging consumers to not patronize the secondary employer because it was unfair to organized labor were held unprotected by the publicity proviso.

The Court believes that it can resolve the present case without necessarily violating the mandates of either the Fourth or Ninth Circuit. The defendants distributed handbills at the Boxhorn entrance which requested that the public not patronize Boxhorn. Furthermore, the handbills strongly imply, if not assert, that the defendants' dispute is with Boxhorn's owner, Mr. Bennett. There is no mention of the non-union subcontractors with whom defendants were engaged in the primary dispute. The Court finds that these handbills violated the Ninth Circuit's requirement that handbills advise the public of the primary dispute's nature and the secondary employer's relation to it.

The Court also finds that pursuant to the Fourth Circuit's test the handbills are not protected by the publicity proviso. The defendants intended to deceive the public with the handbills. Their agents attempted to make Boxhorn's business suffer because of its involvement with the primary employer. Towards this end, the defendants' handbilling exploited the pro-union sympathies of Boxhorn customers by dissuading their patronization of Boxhorn. Achieving this result hinged on the customers understanding that Boxhorn was responsible for hiring the non-union construction workers. The Court refuses to accept defendants' contention that Boxhorn patrons would know that the handbilling was secondary activity simply because Boxhorn was not a construction firm. The handbills' clear import is that Boxhorn hired non-union workers; the public could reasonably believe that Boxhorn was capable of such a hiring decision. Therefore, there was an intent to deceive. Moreover, this deception was material since it involved erroneously identifying the secondary employer as the primary employer.

The Court finds that the defendants' handbills were untruthful and therefore are not protected by the publicity proviso. Likewise, publishing a copy of the handbill in two separate newspapers is not protected by the publicity proviso.

■ The Court finds that defendants' placement of Boxhorn on its "Do Not Patronize" list constitutes an unlawful secondary activity. This action was done for the purpose of forcing Boxhorn to cease its business relationship with the primary employer—Durski. For the reasons stated above, this activity was not protected by the publicity proviso.

## C. First Amendment Protection

■ The defendants contend that even if their activities were not protected by the publicity proviso they were protected by the first amendment. This Court initially finds that the defendants' picketing was not protected by the first amendment. *Longshoremen v. Allied International, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982).

■ The Court finds that the handbilling and reproducing the handbill in publications were also not protected by the first amendment. As stated above, the handbills' contents were untruthful and were therefore not protected by the publicity proviso. To find that the handbills were however protected by the first amendment the Court would have to find the "truthfulness" aspect of the publicity proviso unconstitutional. The Court will not so rule. There is no persuasive reason or authority, and indeed the defendant has offered none,

which compels finding that the first amendment protects untruthful communication designed to place economic pressure on a secondary employer. In enacting the publicity proviso, Congress has balanced the competing interests at stake. The Court defers to that balancing.

### D. Summary of Findings

The Court finds that Boxhorn was a secondary employer. Furthermore, the defendants' secondary activities directed towards Boxhorn constituted coercion and thus are covered by 29 U.S.C. § 158(b)(4). The Court finds that the defendants' picketing, handbilling, publications depicting a picture of a handbill and placement of Boxhorn on its "Do Not Patronize" list are not protected by the publicity proviso to Section 158(b)(4). Likewise, the first amendment does not protect these activities. Therefore, the Court finds that the defendants violated 29 U.S.C. § 158(b)(4) and the sole remaining issue concerns damages.

### IV. Damages

■ Boxhorn seeks compensatory damages pursuant to 29 U.S.C. § 187(b) which states in pertinent part "[w]hoever shall be injured in his business or property by reason of [Section 8(b)(4) ] ... shall recover the damages by him sustained and the cost of the suit." In a case such as the present the injured party is not required to establish its monetary damages to a degree of absolute certainty. Moreover, defendants here bear the risk of any uncertainty. *Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

Relying on *Teamsters Local 20 v. Morton*, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964) and *United Mine Workers v. Gibbs*, 383 U.S. 715, 84 S.Ct. 1130, 16 L.Ed.2d 218 (1965), defendants contend that in a situation where both legal and illegal union activity took place, Boxhorn's recovery, if any, must be limited to losses proximately caused only by the illegal activity. But, *Morton* and *Gibbs* involved situations where the legal and illegal activity could be separated in a reasonable and logical fashion. The present case's circumstances involve such an intertwining of legal and illegal activity and their resulting effects that similar separation is rendered impossible. The Court is similarly unpersuaded by defendants' argument that the "unlawful objective" discussion in *Mead v. Retail Clerks Int. Ass'n., Etc.*, 523 F.2d 1371, 1379 (9th Cir.1975), is controlling here. In *Mead,* the Ninth Circuit discussed a requirement that the unlawful objective, standing alone, must have caused the injury. *Id.* However, the *Mead* court went on to add that evidence supporting a "just and reasonable inference" that the unlawful activity caused the harm sufficiently establishes damages in a secondary boycott case. *Id.* The Court finds in the present case that there is a "just and reasonable inference" that the Union's unlawful activity caused Boxhorn's damages.

At trial the plaintiff proffered evidence to prove its damages by two different approaches in an effort to provide the Court with a reasonably certain means of approximating the losses suffered by plaintiff as a result of the violation of Section 8(b)(4).

The first approach involved the direct calculation of damages based on the testimony of Dick and Lois Bennett. After purchasing the club in 1971 they made extensive efforts to expand club membership. Mr. Bennett testified that prior to the boycott in 1978 they had 1,892 members (Tr. p. 104). He further stated that in their business planning current members were considered the best form of advertising and calculated that, given their constant promotional activity and word-of-mouth advertising, Boxhorn could expect a 15% annual gain in total membership. This rate of growth had been realized before July, 1978, but after the picketing there was a precipitous drop. Based on the number of team withdrawals, an examination of the trap shooting score cards and their personal knowledge of the reasons causing others to drop out, the Bennetts calculated that they lost 416 members because of the Union's illegal activity. Mr. Bennett testified that in his experience each shooter was worth approximately $450.00 in gross sales per

year. This figure consisted of sales of targets, shells, reloading components, guns, clothing, membership fees, and related equipment and accessories. Cost of goods sold took approximately 79.39% of Boxhorn's gross sales (Tr. pp. 108, 109). He also testified that within limits, fixed operating costs were not increased when membership increased. Finally, Mr. Bennett testified that there was a net profit of 20.61% of gross sales.

 Under a condition where incremental operating expenses are nominal, gross profits from the sales may properly be considered in assessing damages. *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477 (7th Cir.1980). Plaintiff calculated its loss of revenue based on the 416 members who withdrew or dropped out, the 15% increment per year in members thereon, its gross sales per member, and its costs of goods sold rate of 79.39% of sales. The calculation encompassing these factors resulted in the net profit figure. Plaintiff then applied an interest factor to this net profit figure because these funds were not available for investment. Calculation by this formula resulted in a 1978 damage estimate of $42,766.00. (See Appendix A to Plaintiff's Post Trial Brief). Adjusted for the occurrence in mid-summer (the 1978 figure multiplied by .45833 or 11/24), plaintiffs arrive at a loss of retail sales of $19,601.00 for 1978. Boxhorn applies similar methodology to succeeding years. (The calculations ignore approximately $300,000.00 in gross wholesale sales at salvage which Bennett calculated were lost.)

 The Court concurs with the general formula utilized above as leading to a "just and reasonable approximation," *Rodgers v. Musicians Local 8,* 403 F.Supp. 870 (E.D.Wis.1975), or as "circumstantial evidence based on reasonable assumptions," *Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226 (7th Cir.1982) providing it is not extended excessively far into the future. The impact of loss of members will dwindle with each passing year. This Court cannot accept Boxhorn's projection that damages will run for nine or ten years into the future. (Plaintiff's Post-Trial Brief Appendix A.)

The other method of assessing damages used at trial was the testimony of Dr. Richard Kaimann, a Professor in the College of Business at Marquette University and the head of Kaimann & Associates, a management consulting firm. He used a regression analysis technique wherein he examined the financial performance of Boxhorn at various pivotal periods during its history and determined a projected rate of growth for the period from March of 1971 to July of 1978. Dr. Kaimann then compared this rate to the actual growth after the Union's unlawful activities in the summer of 1978. Using this method, Dr. Kaimann testified that between 1971 and 1978 plaintiff had growth in gross sales of $2,168.00 per month but between July 1978 and 1980 the sales growth rate flattened out to the point where the demonstration chart (Ex. 35A) shows a virtually horizontal line subsequent to July 1978. The witness further testified that as additional data points were calculated after October, 1980, based on the financial statements and computer calculations therein (Exhibits 35B, C & D), this growth line actually turned negative (Tr. 262). Dr. Kaimann calculated the difference between the two growth lines, applied an interest factor of 10.845% (which he said was the average for 3-month treasury bills for the period 1979 to 1980) calculated a discount figure of 7%, and arrived at a total damage figure for year 4 (1986) of $827,223.00 (Ex. 35D). His calculations of damages to the year of 1983 (year 1 on Ex. 35D) was $410,910.00. The year 1986 was when Kaimann calculated that plaintiff would go out of business based on the projected sales line turning negative. (Dr. Kaimann's analysis did not exclude wholesale figures.)

The testimony of Dr. Kaimann was contradicted by that of Joseph Butala. According to Mr. Butala's analysis total sales did not decline in 1978 or 1979. Defendants argue that both the net income before and after taxes increased over the years and they contend that there is great doubt

that plaintiffs suffered any loss to their business during the period 1978–1980.

The Court is satisfied that the plaintiff was in fact damaged by a concerted campaign to "get Bennett" which was orchestrated by defendants. Further, plaintiff has suffered a substantial loss. The Court has determined that some of the activity of the unions was protected but some clearly violated Section 303. As indicated above, the Court concludes that there is no feasible way of precisely separating the results of legal activity from the results of the illegal activity. The plaintiffs having been damaged by the violations of 29 U.S.C. § 187(a), the Court concludes the direct approach to the calculation of damages represented by the Bennetts' testimony is more precise than that employed by the least squares regression approach of Dr. Kaimann. It does note that on the critical issue regarding the extent to which damages should be projected into the future even Dr. Kaimann testified that it would be "difficult and conceptually erroneous" to project damages beyond four years. The Court agrees. Considering the imprecise nature of damage calculations in secondary boycott cases, the Court is convinced that the Bennett calculations projected over four years and adjusted for interest is "just and reasonable." *Mead, supra.* This just and reasonable approximation can appropriately be used to set damages in this case since the risk of uncertainty "should be thrown upon the wrongdoer instead of upon the injured party." *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1930).

Accordingly the Court finds damages to Boxhorn as follows:

| | |
|---|---|
| 1978 (11/24 of year) | $19,601.00 |
| 1979 | 49,140.00 |
| 1980 | 56,542.00 |
| 1981 | 64,972.00 |
| 1982 (13/24 of year) | 40,483.00 |
| | $230,738.00 |

Defendants are ordered to pay Boxhorn damages in said amount, said liability being joint and several.